## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LEONCIO ELIZARRI, by his Special | ) | |
| Administrator LETICIA PEREZ, | ) | |
| GREGORY L. JORDAN, and | ) | |
| TED VELLEFF, individually and | ) | |
| on behalf of all other similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 17-cv-8120 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| SHERIFF OF COOK COUNTY and | ) | |
| COOK COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Incarceration comes with a significant loss of liberty. Most of us probably think of the inability to come and go as you please, and the separation from loved ones, and rightly so. But another loss is the loss of access to one's personal property. The Cook County Jail and the Illinois Department of Corrections place significant restrictions on the property that detainees and prisoners can have during incarceration.

Plaintiff Leoncio Elizarri entered the Cook County Jail after his arrest, and he had to surrender his property when he entered the facility. The collection of property included an Illinois identification card, sunglasses, jewelry, two Link cards, a CTA reduced fare permit, a library card, and other odds and ends. Later, Elizarri was transferred to the IDOC, and the Sheriff was supposed to transfer some of the property to the IDOC. But instead, the Sheriff retained possession of the property.

In 2017, Elizarri brought this putative class action lawsuit about the property that he and other detainees had to surrender at the Cook County Jail. He claimed that the Sheriff wrongfully retained custody of his property in violation of the Fourteenth Amendment by failing to send it to the IDOC. He later amended his complaint a few times, adding named plaintiffs and adding a Fifth Amendment claim about his clothing.

After years of discovery, Elizarri filed a motion for class certification. The motion focuses on one particular type of personal property: government-issued identification cards. Elizarri and the other named Plaintiffs request certification of a class of all detainees who entered the Cook County Jail with ID cards, and entered the IDOC after November 2015 without them.

To support his motion, Elizarri proffered declarations from 42 former detainees of the Cook County Jail. But the declarations do not lay the foundation for class certification, for a simple reason: 40 of the 42 declarants are not members of the proposed class.

There is almost nothing in the record about how many detainees entered the Jail with IDs, but later exited the Jail and entered the IDOC without them during the class period. Class certification requires a showing of numerosity – that is, that the proposed class is so numerous that joinder would be impracticable. Despite extensive discovery, Plaintiffs have not carried their burden. The motion for class certification is denied.

## Background

When a detainee enters the Cook County Jail, he surrenders his clothing and personal property to the Sheriff for storage and safe-keeping. *See* Pls.' Mem., at 2 (Dckt. No. 150). From that point, where the property goes depends on what happens to the detainee.

If the jail discharges the detainee, the Sheriff returns his property. *Id.* But if the jail transfers the detainee to the IDOC, the Sheriff follows a different procedure. *Id.* Basically,

under Illinois law, it all depends on what type of property the IDOC will accept. *Id.* at 3; *see also* Defs.' Resp. to Pls.' Mtn. for Class Certification, at 4–5 (Dckt. No. 153).

When the detainee is transferred to the IDOC, a county jail must send his property to the IDOC if it is a type of property that the IDOC will accept. Otherwise, the jail must handle the property some other way. An Illinois statute proscribes how to handle the property. "Personal property allowed by the receiving facility shall be transferred with the detainee. Items not transferred shall be disposed of by the transferring facility in accordance with its procedures, for example, having a relative pick up items, mailing items to a person designated by the detainee, etc." *See* Ill. Admin. Code tit. 20 § 710.60(d)(4).

In other words, the fate of the property depends on what the IDOC allows. If the property is the type of property allowed by the IDOC, then the Cook County Jail must send it to the IDOC with the detainee. But if the property is disallowed by the IDOC, then the Sheriff must do something else with the property.

Illinois law also requires the IDOC to give County Sheriffs a list of approved property. *See* Ill. Admin. Code tit. 20 § 535.80(a). The IDOC allows inmates to have "identification cards, legal mail, personal mail, one religious book such as a Bible or Koran, eyeglasses and a wedding band (no stones)." *See* 6/7/2005 IDOC Letter to Sheriffs (Dckt. No. 150-2, at 2 of 2); *see also* Engleson Dep., at 11:11 – 12:19 (Dckt. No. 150-6) (confirming that the 2005 list of allowed property – including identification cards – was still in effect in 2013).[1]

---

[1] Defendants argue that "there is no evidence that Illinois law requires the Cook County Jail to ensure that a detainee's state or local identification cards . . . accompany the detainee to IDOC." *See* Defs.' Resp. to Pls.' Mtn. for Class Certification, at 5 (Dckt. No. 153). They argue that IDOC Superintendent Tracy Engleson's 2013 testimony is "stale" and irrelevant to what the IDOC *currently* accepts. *Id.* Defendants say that Plaintiffs' evidence is old. But Defendants don't dispute Plaintiffs' 2005 IDOC letter or Engleson's 2013 testimony. Nor do they produce an updated list of approved items. Old evidence can still be good evidence. And Defendants have done nothing to refute Plaintiffs' evidence.

Notice the first type of property in that list – identification cards. The IDOC allows inmates to bring ID cards with them.

At the outset, one might wonder why an inmate would need a government identification card while in prison. A driver's license, for example, wouldn't do an inmate much good. Most people don't feel sentimental about their driver's license (unlike a wedding band, or personal mail), and for most people, an ID card has no religious significance (unlike the Bible or the Koran). From a practical standpoint, it's hard to see how an inmate would suffer much harm if he didn't have his ID card.

But putting all of that aside, the key point is that an inmate in the IDOC is allowed to have an ID card. An inmate may not *need* it, but an inmate can still *have* it. So, if the Cook County Jail does not send an inmate's ID card to the IDOC, then the inmate does not have a piece of property that he is otherwise allowed to have. As a technical matter, it's a deprivation of property.

And perhaps more importantly, a prisoner might not need an identification card while in prison, from a practical standpoint. But prison terms come to an end, and when inmates get out, they face the daunting task of reintegrating into society and rebuilding their lives. Finding a job is part of that process. Would-be employees need to prove who they are to find work. And a driver's license would help get them there.

In 2017, Plaintiff Leoncio Elizarri filed this putative class action against the Sheriff of Cook County and against Cook County itself. *See* Cplt. (Dckt. No. 1). Taking a step back, this case wasn't the first time that Elizarri filed suit against the Sheriff and Cook County about his property. In 2007, he filed a class action lawsuit about the Sheriff's failure to prevent the theft or

loss of detainees' belongings. *See Elizarri v. Sheriff of Cook Cnty.*, 901 F.3d 787 (7th Cir. 2018) (affirming a jury verdict in defendants' favor).

While that appeal was pending, Elizarri filed this second suit, meaning the case currently before this Court. He made another challenge about his property, but he offered a new theory. And since filing his original complaint in the case at hand, Elizarri has changed his claims a few times, too.

The case at hand is about the Sheriff's failure to send property to the IDOC. Elizarri claimed that the Sheriff had failed to send "compliant property" – meaning property that the IDOC would accept – to the IDOC when Elizarri left the Jail and entered IDOC custody. *See* Cplt., at ¶ 26 (Dckt. No. 1). When he was arrested, Elizarri had $22.50, a driver's license, a Social Security card, a cell phone, and a few other belongings. *Id.* at ¶ 22.

Instead of sending the property to the IDOC, the Sheriff "continu[ed] to hold plaintiff's personal property" in violation of the Fourth and Fourteenth Amendments.[2] *Id.* at ¶¶ 27–28. Elizarri sought an injunction "requiring the Sheriff to return all property belonging to former detainees at the Jail and to make appropriate restitution for property that has been lost, misplaced, or stolen." *Id.* at 7.

Elizarri later filed an amended complaint that added Gregory Jordan as a named plaintiff. *See* First Am. Cplt. (Dckt. No. 42). When Jordan was arrested, his personal property included keys, a state identification card, a Social Security card, a wallet, and a belt. *Id.* at ¶ 30.

About a year later, the case was reassigned from Judge Durkin to this Court. At the initial status hearing (during the so-called cattle call for each of the 342 reassigned cases), defense counsel made a significant revelation. *See* 11/8/2019 Tr., at 17–23 (Dckt. No. 89).

---

[2] The operative complaint is the Second Amended Complaint. Plaintiffs no longer invoke the Fourth Amendment. *See* Second Am. Cplt. (Dckt. No. 140).

Defense counsel reported that Defendants had located the property of the two named Plaintiffs. In fact, defense counsel sent a letter to Plaintiffs' counsel in August *2018* – more than a year earlier – about the discovery of the property. *See* 11/14/2019 Letter (Dckt. No. 88) (attaching letters to counsel dated August 17, 2018 and September 23, 2019); *see also* Initial Status Report for Reassigned Case, at 2 (Dckt. No. 79) ("The Sheriff has notified the Plaintiffs that specific items of their property have been located.").

But nothing had been done.

Defendants were ready to return the property to Plaintiffs, and Plaintiffs were ready to receive it from Defendants. *See* 11/8/2019 Order (Dckt. No. 85) ("Defendants do not object to returning the Plaintiffs' property, and Plaintiffs do not object to the return of their property. Everyone agreed at the hearing that the property should be returned."). Plaintiffs wanted their property, and Defendants wanted to give it back.

Peace, seemingly, was breaking out. This Court did not see a need for an injunction to compel Defendants to do something that they were willing to do voluntarily. So, this Court directed the parties to come back to the courthouse at a later time, and complete the property exchange. *Id.* The parties agreed to the property exchange, without objection:

| | |
|---|---|
| The Court: | But to the best of your knowledge, do the defendants still have the plaintiffs' personal property? |
| Defense Counsel: | Yes. |
| The Court: | Do you know where it is? I mean, your clients, do they know where it is and can they get it? |
| Defense Counsel: | I believe they can, Judge. |

\*　　　\*　　　\*

| | |
|---|---|
| The Court: | Have the plaintiffs made any attempt to retrieve their property? |
| Plaintiffs' Counsel: | No. Well, I mean, not after filing the lawsuit. |
| The Court: | In – since 2017, have the plaintiffs made any attempt to retrieve their property? |
| Plaintiffs' Counsel: | No. |
| | *      *      * |
| The Court: | I'll be real direct with you. When I read this report, I thought to myself, should I just order the defendants to bring the property to my courtroom and we'll just do a little handoff. Would anyone object to that? |
| Defense Counsel: | No. |
| Defense Counsel: | We have no objection. |
| Plaintiffs' Counsel: | We would not object. |
| | *      *      * |
| The Court: | But it seems to me, candidly, like it's a waste of time and money and resources to continue to do the lawsuit, especially the expense of discovery, when peace seems to be on the verge of breaking out. |

*See* 11/8/19 Tr., at 18:19-24, 21:20 – 22:1, 22:11-18, 24:15-18 (Dckt. No. 89).

That property exchange took place outside the courtroom on December 6, 2019. *See* 12/6/2019 Order (Dckt. No. 96). The parties filed a stipulation to memorialize the return of the property. *See* Letter (Dckt. No. 95); Stipulation (Dckt. No. 97).

For Elizarri, the returned property included an Illinois identification card,[3] a Chicago library card, sunglasses and cases, two Links cards, jewelry, and a few other items. *See*

---

[3] The Court understands the Illinois identification card to be a driver's license. *See* 8/17/18 Letter (Dckt. No. 150-7).

7

12/6/2019 Letter (Dckt. No. 95).  For Jordan, the returned property included a wallet, business cards, CTA fare cards, a Social Security card attachment, a Social Security letter, part of a dollar bill, and so on.  *Id.*

Defendants later found another bag containing Jordan's property, and a second property exchange took place.  *See* 1/17/2020 Status Report (Dckt. No. 100); 1/22/2020 Order (Dckt. No. 102); 4/27/2020 Order (Dckt. No. 114); 7/26/2020 Status Report (Dckt. No. 121); 10/22/2020 Order (Dckt. No. 126); 10/28/2020 Status Report (Dckt. No. 127); 10/30/2020 Order (Dckt. No. 128).  The returned property included a "copy" of an Illinois identification card.  *See* 7/26/2020 Status Report.

At that point, the return of the property was complete.  Elizarri and Jordan agreed that they received all of their property.  Simply put, "Defendants have returned all the property belonging to the named plaintiffs."  *See* 10/28/2020 Status Report (Dckt. No. 127).

The return of the property called into question whether Elizarri and Jordan could serve as adequate class representatives.  *See* 11/16/2020 Order (Dckt. No. 129).  Elizarri and Jordan can't represent a class of people seeking the return of their property if Elizarri and Jordan aren't seeking the return of their property.  But the answer could be different to the extent that they seek compensation (if any) for the deprivation of their property in the past.  It may depend on whether the class is seeking prospective or retrospective relief.

Plaintiffs then requested and received leave to amend the complaint yet again, adding Ted Velleff as a class representative.  *See* Mtn. to Amend Cplt. (Dckt. No. 132); 4/19/2021 Order (Dckt. No. 136); Second Am. Cplt. (Dckt. No. 140).  Plaintiffs expressly did so in light of the concern about whether Elizarri and Jordan could continue to serve as class representatives, given the return of their property.  *See* Mtn. to Amend Cplt., at 2 ("The proposed amended complaint

therefore adds Ted Velleff, a former detainee at the Jail, as a plaintiff to ensure that the putative class will be adequately represented.").

When Velleff was arrested, he had a state identification card, a belt, white shoelaces, and a few documents in his possession. *See* Second Am. Cplt., at 29 (Dckt. No. 140); 7/14/2021 Status Report (Dckt. No. 148).

The Second Amended Complaint includes three claims about Defendants' handling of detainees' clothing and government identification. Before, Plaintiffs only brought claims about compliant property (like ID cards). But the Second Amended Complaint added claims about detainee clothing, which is non-compliant property for the IDOC (meaning that they weren't allowed to have it). *See* Second Am. Cplt., at ¶ 16 (Dckt. No. 140) (confirming that clothing is compliant property for the Cook County Jail, but is non-compliant property for the IDOC).

First, Plaintiffs allege that Defendants took detainees' clothing and gave it away in violation of the Takings Clause of the Fifth Amendment. *Id.* at ¶¶ 17–22. The Fifth Amendment claim is about clothes, as revealed by the text and the heading: "THE TAKINGS CLAIM: DETAINEE CLOTHING." *Id.* at 4.

Second, they claim that Defendants destroyed "stored detainee property" – including identification cards and other items – without notice in violation of the Fourteenth Amendment. *Id.* at ¶¶ 23–39. Plaintiffs alleged that the Sheriff stopped destroying IDOC non-complaint property in 2008, but resumed that practice in 2018. *Id.* at ¶¶ 24, 36. That claim didn't fit well with two (if not three) of the named Plaintiffs. The Sheriff "returned the Elizarri property during the pendency of this ligation," and "located and returned two of the bags inventoried from plaintiff Jordan." *Id.* at ¶¶ 30, 31.

Third, Plaintiffs allege that Defendants failed to give notice to detainees that their property was available for pickup, in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at ¶¶ 40–43.

Plaintiffs later moved for class certification. *See* Pls.' Mtn. for Class Certification (Dckt. No. 146). Plaintiffs originally sought to certify a "clothing" subclass and a "government identification" subclass. *See* Pls.' Mtn. for Class Certification, at 1 (Dckt. No. 146). But in their briefs, Plaintiffs narrowed the motion, withdrawing the motion for class certification for the clothing subclass. *See* Pls.' Mem., at 1–2 (Dckt. No. 150); Pls.' Reply, at 1 (Dckt. No. 155).

After that whittling, Plaintiffs now ask the Court to certify a class of "[a]ll persons who left the Cook County Jail to serve a sentence in the Illinois Department of Corrections on and after November 9, 2015 and whose government issued identification remained in the custody of the Sheriff of Cook County." *See* Pls.' Reply, at 8 (Dckt. No. 155); *see also* Pls.' Mtn. for Class Certification, at 1 (Dckt. No. 146).

Meanwhile, Defendants located property belonging to Velleff (from his detention in 2013), and returned those items on June 16, 2021. *See* 7/14/2021 Status Report (Dckt. No. 148); 7/27/2021 Order (Dckt. No. 151). For Velleff, the returned property included an Illinois identification card, a belt, shoelaces, and some documents. *See* 7/14/2021 Status Report.

Velleff questioned whether the Jail also has more property, from his detention in 2009, and again in 2010, and again in 2016. *See* 8/6/2021 Status Report (Dckt. No. 152). But Defendants could not locate any such property. *Id.* at 2.

Velleff doesn't know if Defendants have returned all of his property. Velleff is "unable to form at the present time a belief, consistent with Rule 11 . . . about whether the Sheriff continues to possess the property listed in the preceding paragraph." *Id.* at 2.

10

In sum, the proposed subclass covers detainees who entered the Cook County Jail with a government ID, but left the Jail without it. Two of the three named Plaintiffs (Elizarri and Jordan) have received all of their property from the Defendants, including their IDs. The third named Plaintiff (Velleff) isn't sure, but he can't say consistent with Rule 11 whether Defendants still have any of his property.

## Legal Standard

"[A] proposed class under Rule 23(b) must meet the requirements of Rule 23(a) – numerosity, typicality, commonality, and adequacy of representation – and one of the alternatives listed in Rule 23(b)." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 597 (7th Cir. 2021) (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012)). When a plaintiff seeks certification for a damages class under Rule 23(b)(3), a court must find that common questions of law or fact "predominate" over individual questions, and that a class action is "superior" to other methods of adjudicating the case. *Id.*; *McFields v. Dart*, 982 F.3d 511, 515 (7th Cir. 2020). The class must also meet Rule 23's "implicit requirement of 'ascertainability,'" meaning that the class is "defined clearly and based on objective criteria." *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

The plaintiffs bear the burden of proving that their proposed class satisfies Rule 23 by a preponderance of the evidence. *See Howard*, 989 F.3d at 597. "Failure to meet any of the Rule's requirements precludes class certification." *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

"Rule 23 is more than 'a mere pleading standard.'" *Howard*, 989 F.3d at 597 (quoting *Wal-Mart*, 564 U.S. at 350). A Court does not take the plaintiff's allegations at face value when evaluating the Rule 23 factors. *Id.* The court "must go beyond the pleadings and, to the extent

necessary, take evidence on disputed issues that are material to certification." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018); *see also Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001).

A court's analysis will "entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Wal-Mart*, 564 U.S. at 351. But "[t]he merits themselves are 'not on the table' at this early stage." *Howard*, 989 F.3d at 597 (quoting *Beaton*, 907 F.3d at 1025). Courts cannot "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## Discussion

## I.    Defining the Claims of the Government Identification Subclass

Before diving in, the Court needs to pin down what claims, exactly, are covered by the motion for class certification. A "threshold inquiry" in any section 1983 suit is determining which "'specific constitutional right' [is] at issue." *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).

Identifying the constitutional right at issue is no less important at the class certification stage. "'Analysis of predominance under Rule 23(b)(3),' and thus of commonality under Rule 23(a)(2), 'begins . . . with the elements of the underlying cause of action.'" *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 413 (N.D. Ill. 2012) (quoting *Messner*, 669 F.3d at 815). Before certifying a class, a district court needs to know what the class claims would be.

Plaintiffs originally moved to certify two subclasses, including a clothing subclass and a government identification subclass. *See* Pls.' Mem., at 1 (Dckt. No. 150); *see also* Pls.' Mtn. for Class Certification, at 1 (Dckt. No. 146). But Plaintiffs later dropped the demand to certify the

clothing subclass after the Seventh Circuit's decision in *Conyers v. City of Chicago*, 10 F.4th 704 (7th Cir. 2021). *See* Pls.' Reply, at 8 (Dckt. No. 155). All that remains is the government identification subclass. *Id.*

Plaintiffs waffled on the constitutional right at issue for the government identification subclass. Out of the gate, in their motion for class certification, Plaintiffs described the class as a "Fourteenth Amendment Damages Subclass." *See* Pls.' Mtn. for Class Certification, at 1 (Dckt. No. 146). That position was consistent with the complaint, which alleged that Defendants had retained and destroyed property – including "various forms of identification, such as a driver's license or social security card" – in violation of the Fourteenth Amendment. *See* Second Am. Cplt., at ¶ 27 (Dckt. No. 140).

But in their supporting memorandum, Plaintiffs seemed to try to expand the constitutional boundaries. Plaintiffs defined the government identification subclass to include both the Fifth Amendment and the Fourteenth Amendment. They requested certification of a subclass of "[p]ersons whose government issued identification remained in the custody of the Sheriff of Cook County (Fifth and Fourteenth Amendment Damages Subclass)." *See* Pls.' Mem., at 1 (Dckt. No. 150).

That sentence, it seems, was not a slip-up. A later sentence stated that a "common question" was "whether the Sheriff's policy of not sending government issued identification to the Illinois Department of Corrections resulted in a taking of property without compensation in violation of the Fifth Amendment or, alternatively, a denial of property without due process, in violation of the Fourteenth Amendment." *Id.* at 9. The reply brief made the same point. *See* Pls.' Reply, at 7 (Dckt. No. 155) (arguing that they are challenging the legality of the Sheriff's government identification policy under "the Fifth and Fourteenth Amendments").

13

That definition is a problem, because there is no Fifth Amendment claim about the government identification cards. The claim about the ID cards falls under the Fourteenth Amendment, not the Fifth Amendment. *See* Second Am. Cplt., at ¶¶ 23–44 (Dckt. No. 140).

The Second Amended Complaint does include a Fifth Amendment claim, but it involves clothing (only). *See* Second Am. Cplt., at ¶¶ 17–22 (Dckt. No. 140); *see also id.* at ¶ 44. The claim appears under the heading: "THE TAKINGS CLAIM: DETAINEE CLOTHING." The Jail had a "widespread practice . . . to seize the *clothing* of detainees leaving the Jail for the Illinois Department of Corrections," and that "practice was applied to *clothing* belonging to plaintiffs Elizarri, Jordan, and Velleff." *Id.* at ¶¶ 18–19 (emphasis added).

Plaintiffs had more than ample opportunity to add a Fifth Amendment claim about the ID cards, if that is what they wanted to do. At the initial hearing after reassignment, this Court *sua sponte* drew attention to the fact that the case did not appear to involve a takings claim under the Fifth Amendment. *See* 11/15/2019 Tr., at 13:21-24 (Dckt. No. 89); *see also* 12/6/19 Order (Dckt. No. 96). The "first explicit reference to the Fifth Amendment" appeared in the original motion for class certification in December 2019. *See* Pls.' Mem. on First Reference to Fifth Amendment (Dckt. No. 98); *see also* Pls.' Mtn. for Class Certification, at 4 (Dckt. No. 92).

Months passed, without Plaintiffs attempting to add a Fifth Amendment claim. On November 16, 2020, this Court directed the parties to propose an updated schedule, including a proposed deadline to amend the pleadings. *See* 11/16/2020 Order (Dckt. No. 129). The parties agreed upon a deadline of November 25, 2020 to file any motions to amend the pleadings, and this Court later adopted that deadline. *See* 11/23/2020 Joint Status Report (Dckt. No. 130); 11/24/2020 Order (Dckt. No. 131).

14

On the deadline, Plaintiffs moved for leave to file a Second Amended Complaint to add a Fifth Amendment claim (and a new named Plaintiff). *See* Pls.' Mtn. (Dckt. No. 132). The motion stated that the "proposed second amended complaint also adds clarity to the Fifth Amendment Takings claim." *Id.* at 3; *see also* Redline of Proposed Second Am. Cplt. (Dckt. No. 132-2). It "add[ed] clarity" only in the sense that it added something that didn't exist before.

This Court granted the motion, over Defendants' objection, and allowed Plaintiffs to file the Second Amended Complaint. *See* 4/19/2021 Order (Dckt. No. 139). This Court gave Plaintiffs that opportunity because the Fifth Amendment had "lurked in the background of the case" ever since reassignment. *Id.*; *see also id.* ("In fact, in December 2019, after this Court flagged the fact that the Fifth Amendment is not part of the then-operative complaint, Plaintiffs filed a statement addressing the Fifth Amendment.").

Plaintiffs then filed the Second Amended Complaint, adding a Fifth Amendment claim. But again, that claim was limited to the clothing. This Court gave Plaintiffs leave to bring a Fifth Amendment claim, and in response, Plaintiffs brought that claim about clothing (only). Not about ID cards.

Changing that deadline now would require a showing of good cause under Rule 16, which isn't the case here. *See* Fed. R. Civ. P. 16(b)(4). Plaintiffs haven't asked to move the schedule, and they haven't moved to amend the complaint, either. *See* Fed. R. Civ. P. 15(a)(2). And under the Federal Rules, briefs about a motion for class certification are not the right route to seek permission to amend the complaint. *Id.*; *see also* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion.").

The window of opportunity to amend the complaint to add a Fifth Amendment claim about ID cards has long since closed. It is too late to bring a Fifth Amendment claim about the

government identification. The case was filed in 2017. Litigation cannot go on forever. At some point, the target needs to stop moving.

The Federal Rules contemplate the "speedy" resolution of disputes. *See* Fed. R. Civ. P. 1 ("These rules . . . should be construed . . . to secure the . . . speedy . . . determination of every action and proceeding."). A lot of words come to mind when the Court thinks about adding a new claim four years after filing the case. "Speedy" isn't one of them.

The need for speed exists for a lot of compelling reasons. Never-ending amendments – long after deadlines have passed – drain the resources of the parties and the judiciary. It undermines public confidence in the judicial process, and interferes with the need for finality.

Late-breaking amendments make it more difficult to resolve the case on the merits, too. Evidence does not improve with the passage of time. After years of litigation, memories fade. Witnesses forget key facts, or lose interest, or become unavailable. And jurors inevitably wonder what took so long, and why the case still matters.

Extending a case imposes other costs, too. Everyone's time is zero sum, and a district court judge is no exception. Any time that a court spends on a case is less time that a court can spend on hundreds of other cases on his or her docket. The longer any case goes, the shorter the amount of time that a court can spend on everything else.

And in any event, there are serious questions about whether the named Plaintiffs here could represent a class on a Fifth Amendment claim about their ID cards anyway. After all, a named plaintiff must be a member of the class. *See* Fed. R. Civ. P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members . . . ."); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) ("[A] class representative must be part of the class . . . .") (citation omitted). Elizarri and Jordan received all of their

16

property, including their ID cards. Velleff thinks that he surrendered additional property during three other arrests, but he doesn't know if the Jail still has it.

In sum, this Court understands the motion to request certification of a government identification subclass under the Fourteenth Amendment. There is no Fifth Amendment claim about the ID cards, so there is no such class to certify. Even if Plaintiffs had requested class certification on a claim under the Fifth Amendment, the result on the motion for class certification would be the same.

## II.     The Motion for Class Certification

The larger question is whether Plaintiffs satisfied the requirements for class certification under Rule 23. Plaintiffs moved to certify a class of "[a]ll persons who left the Cook County Jail to serve a sentence in the Illinois Department of Corrections on and after November 9, 2015 and whose government issued identification remained in the custody of the Sheriff of Cook County." *See* Pls.' Reply, at 8 (Dckt. No. 155); *see also* Pls.' Mtn. for Class Certification, at 1 (Dckt. No. 146).

Rule 23 requires a plaintiff to clear a number of hurdles before the case can proceed as a class action. The first series of hurdles appears in Rule 23(a). That rule requires a showing of numerosity, commonality, typicality, and adequacy:

> **(a)  Prerequisites.**  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1)  the class is so numerous that joinder of all members is impracticable;
> >
> > (2)  there are questions of law or fact common to the class;
> >
> > (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

*See* Fed. R. Civ. P. 23(a) (bold in original).

As the text of the Rule makes clear, the requirements for class certification are non-negotiable. The very first word – "Prerequisites" – sends an early, unmistakable message. *Id.* The phrase "only if" doubles down on that directive. *Id.* If a proposed class can't satisfy the requirements of Rule 23, it isn't a class.

Courts aren't in the business of assuming away the requirements of Rule 23. "Failure to meet any of the Rule's requirements precludes class certification." *Arreola*, 546 F.3d at 794. "Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily [courts] begin there and only turn [] to Rule 23(b) after [the court is] certain that all of Rule 23(a)'s requirements ha[ve] been met." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015).

The motion at hand begins and ends with the very first requirement under Rule 23: numerosity.

Numerosity isn't a small thing when it comes to class actions. In fact, numerosity is the leadoff hitter under Rule 23. The very first – *the most basic* – requirement for a class action is the need for a big group of people.

Numerosity requires that "the class is so numerous that joinder of all members is impracticable." *See* Fed. R. Civ. P. 23(a)(1). "While 'impracticable' does not mean 'impossible,' a class representative must show 'that it is extremely difficult or inconvenient to join all the members of the class.'" *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (citing 7A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1762 (3d ed. 2020)).

18

"[A] forty-member class is often regarded as sufficient to meet the numerosity requirement." *Id.* (quoting *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017)). "But a class of 40 or more does not guarantee numerosity." *Id.* (citing *Pruitt v. City of Chicago*, 472 F.3d 925, 926 (7th Cir. 2006)).

Pinning down the exact number of class members before class certification is not necessary. A "class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020) (quoting *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014)).

Courts "may make common sense assumptions to determine numerosity." *Molinari v. Fin. Asset Mgmt. Sys., Inc.*, 2020 WL 434518, at *4 (N.D. Ill. 2020) (quoting *Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015)); *see also Arreola*, 546 F.3d at 797; *Wilson v. City of Evanston*, 2017 WL 3730817, at *7 (N.D. Ill. 2017); 1 William Rubenstein *et al.*, Newberg on Class Actions § 3:13 (5th ed. 2015) ("Generally, a plaintiff must show enough evidence of the class's size to enable the court to make commonsense assumptions regarding the number of putative class members.").

But courts "can only do so if there is underlying evidence upon which to base [those] assumptions. Otherwise, the so-called 'common-sense' assumptions are nothing more than speculation." *Molinaro*, 2020 WL 4345418, at *5 (citing *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 485 (3d Cir. 2018); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596–97 (3d Cir. 2012)); *see also* 5 James Wm. Moore, Moore's Federal Practice § 23.22(3) (3d ed. 2021) ("[T]he class proponent generally must proffer *evidence* to the number of members in the purported class, or at least a reasonable estimate of that number.") (emphasis added).

After all, the party seeking class certification bears the burden of proving that a proposed class is sufficiently numerous by a preponderance of the *evidence*. *See Anderson*, 986 F.3d at 777; *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). So "the party supporting the class *cannot* rely on mere speculation or conclusory allegations as to the size of the putative class . . . for numerosity purposes." *Arreola*, 546 F.3d at 797 (quotation marks omitted) (emphasis added); *see also Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989); 5 James Wm. Moore, Moore's Federal Practice § 23.22(3) (3d ed. 2021).

Numerosity is not a high hurdle. The Court can make assumptions, and a plaintiff only needs to prove numerosity by a preponderance of the evidence. But even a low hurdle, like an extension cord, can lead someone to trip. And Plaintiffs tripped.

Plaintiffs devote almost no attention to the requirement of numerosity. The supporting brief includes only two paragraphs about the issue. *See* Pls.' Mem., at 7–8 (Dckt. No. 150). One of them includes citations to case law, only. The one paragraph that discusses the record includes only three sentences. *Id.* at 7. The third sentence is about clothing, which isn't part of this proposed class. So, the brief includes only two sentences about numerosity when it comes to a class about government IDs.

Plaintiffs begin with an appeal to common sense, based on documents not in the record. Plaintiffs state that "[r]ecords produced by the Sheriff through FOIA requests show that more than 35,000 persons were sent from the Cook County Jail to IDOC since November 8, 2015." *Id.*

That statement does not have support in the record, because Plaintiffs did not file the underlying documents. So this Court cannot confirm how many people went from the Cook

County Jail to the IDOC during the proposed class period (*i.e.*, since November 8, 2015). But it is undoubtedly a big number, in the thousands. And whatever it is, the number easily soars over the hurdle for class certification.

But that's just a start. The proposed class does not include everyone who went from the Cook County Jail to the IDOC. The proposed class covers the detainees who entered the Jail *with* their ID cards and went to the IDOC *without* their ID cards. *See, e.g.*, *Kohn v. Mucia*, 776 F. Supp. 348, 353 (N.D. Ill. 1991) (finding that a plaintiff seeking to certify a class of Illinois residents whose registered cars were seized and disposed of failed to establish numerosity where they offered evidence of the total number of cars the City of Chicago disposed of, but not any evidence that the cars were properly registered).

The proposed class definition includes two implicit requirements. It covers detainees who entered the Cook County Jail *with* IDs. And it covers detainees who left the Cook County Jail *without* them. So, by definition, it excludes people who were arrested and detained without ID cards. And it excludes people who did, in fact, receive their ID cards from the Jail and take them to the IDOC.

At some point, common sense can get you only so far. How many people get arrested while carrying ID cards? Do most people who get arrested carry IDs with them? Maybe, or maybe not. It doesn't seem like a great idea. Nothing good could come from robbing a store while carrying an ID.

But it's fair to assume that lots of people get arrested with ID cards, wind up at the Cook County Jail, and then get shipped to the IDOC. That leaves the second important part of the equation: the number of people who left the Cook County Jail without their ID cards.

21

Plaintiffs' argument rests on a single sentence. "Although plaintiffs do not have data showing the number who entered the Jail with government issued identification, a sampling of 42 persons who left the Jail for IDOC between 2013 and 2016 (when more than 57,000 persons left the Jail for IDOC) shows that 39 had government issued identification." *See* Pls.' Mem., at 7 (Dckt. No. 150). By that sentence, Plaintiffs mean that 39 of the 42 detainees entered with IDs and left without them.

The brief cites a collection of declarations from 42 inmates at the IDOC. *See* Declarations (Dckt. No. 150-12). Each declarant stated that he entered the Cook County Jail with property, and left the Cook County Jail without it. Each declaration includes the following sentence (or something similar): "When I entered the Cook County Jail, my personal property included my keys, social security card, state id card, wallet, and belt." *Id.* But some inmates crossed out some of the words, or otherwise modified the text. One inmate did not mention IDs at all. A few people crossed out the references to IDs.

Of those 42 people, 39 had ID cards with them when they entered the Jail. *See* Pls.' Mem., at 7 (Dckt. No. 150); *see also* Declarations, at 4, 21 (Dckt. No. 150-12); *see also id.* at 18, 30, 33.[4] Each declaration ends with the same sentence: "None of my personal property came to the IDOC from the Cook County Jail." *See* Declarations.

---

[4] Plaintiffs do not identify with specificity which three declarations (out of the 42 declarations) came from detainees who entered the Jail without a government issued ID. For two declarations, it is easy. *See* Declarations, at 4, 21 (Dckt. No. 150-12). But identifying the last declarant who entered without an ID is more difficult. There are two ambiguous declarations that might fit the mold. First, Mosley stated that he entered the Jail with "my social security card, and wallet." *See* Declarations, at 30. But the parties don't explain if a "government-issued identification" includes a social security card. In their brief, Plaintiffs explain that the named Plaintiffs each had a *state* issued ID or driver's license, but the proposed class broadly refers to *government* issued IDs. *See* Pls.' Mem., at 4 (Dckt. No. 150). Second, Robinson crossed out typewritten text referring to his driver's license and state ID card, but then wrote "True" next to the items he crossed out. *See* Declarations, at 33. Crossing out those items, and then adding "True," seems contradictory. Maybe Robinson meant that he did enter the Jail with property, but didn't enter with the types of property listed in the typewritten text. A third declaration looked ambiguous at first, but the handwritten explanation cleared things up. Henderson crossed out typewritten text referring to "state

Without saying so out loud, Plaintiffs implicitly ask this Court to extrapolate that roughly 92% – 39 out of 42 – of detainees entered the Jail with an ID, and entered the IDOC without it. Or, at the very least, they ask for a softer inference that lots of people entered the Cook County Jail with government identification but entered the IDOC without it.

A few problems jump off the page.

For starters, Plaintiffs describe the declarations as a "sampling" of detainees who left the Jail for the IDOC. But Plaintiffs don't reveal how, exactly, they obtained the declarations. Is it a *random* sampling? Or, is it the product of cherry picking? Maybe it is a representative sample, or maybe not. Cherry picking would matter if Plaintiffs intended to use the sample to create an inference about people not in the sample, meaning the broader group. But cherry picking would not matter if they had identified at least 40 prospective class members. *See Anderson*, 986 F.3d at 777 ("[A] forty-member class is often regarded as sufficient to meet the numerosity requirement.").

But there is a bigger issue. Most of the declarations are from detainees who do not fall within the class definition. The proposed class covers detainees "who left the Cook County Jail to serve a sentence in the IDOC on and after November 9, 2015." *See* Pls.' Reply, at 8 (Dckt. No. 155); *see also* Pls.' Mtn. for Class Certification, at 1 (Dckt. No. 146).

Only 2 of the 42 declarants stated that the Jail transferred them to the IDOC on or after November 9, 2015. *See* Declarations, at 30, 40 (Dckt. No. 150-12). The other 40 declarants left

---

ID[s]." But the handwriting resolved the ambiguity: "The items I did not receive upon arrival IDOC Stateville CC intake is the items cross [sic] out above. But did have items prior to arrest and upon arriving at Cook County Jail." *See* Declarations, at 18. So, this Court assumes that either Mosley or Robinson is the third person (with Brown and Johnson) who arrived at the Jail without an ID. *See* Declarations, at 4, 21, 30, 33.

the Cook County Jail and entered the IDOC before the class period began. They're not in the proposed class.

So, Plaintiffs have the burden of establishing numerosity, that is, showing that the proposed class is so numerous that joinder would be impracticable. *See* Fed. R. Civ. P. 23(a). To meet that burden, Plaintiffs came forward with 42 declarations. But 40 of the 42 declarations are from people who do not fall within the class definition.

And it gets worse. Two of the declarations came from two named plaintiffs, Jordan and Velleff. But they don't fall within the class period, either. *See* Declarations, at 22, 39 (Dckt. No. 150-12). Jordan arrived at the IDOC on March 13, 2015. *Id.* at 22. Velleff arrived at the IDOC on January 24, 2014. *Id.* at 39. But again, the proposed class covers former detainees who "left the Cook County Jail to serve a sentence in the Illinois Department of Corrections on and after November 9, 2015." *See* Pls.' Reply, at 8 (Dckt. No. 155).

Viewing the record as a whole, Plaintiffs came forward with only two declarations from former detainees who fall within the proposed class definition. They entered the Cook County Jail with ID cards, and went to the IDOC without ID cards after November 9, 2015.[5] That's not much of a showing.

A district court can make common sense assumptions, but the assumptions must rest on underlying evidence. *See Molinaro*, 2020 WL 4345418, at *5. And here, the evidence is next to nothing. The Court is "unwilling to pile assumption and inference upon further assumption and

---

[5] And even then, that's an inclusive reading of the phrase "government issued identification." *See* Pls.' Reply, at 8 (Dckt. No. 155). Two of the 42 declarants fall within the class definition. *See* Declarations, at 30, 40 (Dckt. No. 150-12). One of them had a "state id card" and a social security card. *Id.* at 40. But the other detainee only had a social security card, not a driver's license or a state ID card. *Id.* at 30. The Court reads the phrase "government issued identification" to cover a social security card (even though parts of Plaintiffs' briefs could be read otherwise, because they refer to state ID cards).

24

inference to find that plaintiffs have met their burden of demonstrating numerosity." *See*

*Narwick v. Wexler*, 901 F. Supp. 1275, 1279 (N.D. Ill. 1995).

On its own, this Court did notice testimony in the record about the Sheriff's practice

about returning ID cards. Roberto Ornelas, a Cook County Sheriff's Deputy, testified that the

Cook County Jail does not send the government-issued IDs to the IDOC (at least not "upon their

shipment"). *See* Ornelas Dep., 21:20 – 22:2 (Dckt. No. 153-2) ("Q: If there is a government

issued identification in this property that the prisoner arrived with . . . is any effort made to

remove that government issued ID and send it to IDOC with the prisoner? A: No, we do not

give identifications to the detainees upon their shipment.").

That testimony cannot get Plaintiffs over the hump, for a few reasons. The most basic

reason is the fact that Plaintiffs made no such argument. Plaintiffs did not offer that passage

when discussing numerosity, and thus it is waived. *See Williams v. Dieball*, 724 F.3d 957, 961

(7th Cir. 2013). Also, the testimony was more tentative than it might appear at first blush. The

Deputy testified that the Jail does not give ID cards to the detainees "upon their shipment." That

is not the same as saying that the Jail does not send the ID cards to the IDOC at all. And most

importantly, the passage includes no numbers. There is no telling how many people go from the

Jail to the IDOC without ID cards.

The thin record is especially unfortunate given the age of the case, and given how many

chances Plaintiffs had to build a record. This is a 2017 case. *See* Cplt. (Dckt. No. 1). On July

16, 2018, Judge Durkin set a deadline of December 7, 2018 for the close of class discovery. *See*

7/16/18 Order (Dckt. No. 31). Later, Judge Durkin set a fact discovery deadline of June 18,

2019. *See* 12/20/18 Order (Dckt. No. 54).

Since then, Plaintiffs requested and received quite a few extensions. *See* 6/10/2019 Order (Dckt. No. 70) (setting a fact discovery deadline of September 17, 2019); 9/5/2019 Order (Dckt. No. 76) (setting a fact discovery deadline of November 18, 2019).

After reassignment, the parties expressed that they were "somewhat hopeful that they will complete fact discovery by 12/31/2019." *See* Initial Status Report for Reassigned Case, at 3 (Dckt. No. 79). But the parties requested and received more extensions. *See* 12/6/2019 Order (Dckt. No. 96); 3/2/2020 Order (Dckt. No. 105). At one point, this Court directed: "Absent exceptional circumstances, the parties should expect this extension of discovery to be the last." *See* 3/2/2020 Order.

More requests for more extensions followed, which this Court granted with great reluctance. *See* 10/22/2020 (Dckt. No. 126) ("Any request for an extension must bear in mind that this case was filed in 2017."); 10/30/2020 (Dckt. No. 128) ("As requested, the Court extends the fact discovery deadline to January 29, 2021. Given the age of the case, this extension is the last."); *see also* 1/29/2021 Order (Dckt. No. 136) (denying a request for a late deposition, and summarizing the discovery extensions); 4/19/2021 Order (Dckt. No. 139) (authorizing two more months of discovery in light of the filing of the Second Amended Complaint) ("This case was filed in 2017, and it is high time for discovery to end. As this Court has recounted in its Order dated January 29, 2021, this Court has extended the fact discovery deadline at least six times."); 4/26/2021 (Dckt. No. 142) ("The joint motion to reset discovery close date . . . is hereby granted, with more than a little reluctance. . . . This extension is the last, full stop. The deadline will not move absent something akin to a medical emergency."); 1/3/2022 Order (Dckt. No. 165) ("Fact discovery in this 2017 case is finally closed.").

When Plaintiffs filed their motion for class certification in 2021, they already had the benefit of years of discovery. Class discovery opened in mid-2018, when Judge Durkin set a class discovery deadline of December 2018. *See* 7/16/18 Order (Dckt. No. 31). Plaintiffs filed their motion for class certification three years later. *See* 6/16/21 Pls.' Mtn. for Class Certification (Dckt. No. 146).[6] By any measure, that's plenty of time. Whatever the reason for the barren record, a lack of time isn't it.

And even then, Plaintiffs did not use those years to gather new declarations for the case at hand. The 42 declarations in the record are dated early 2016. *See* Declarations (Dckt. No. 150-12). That means they were created at least a year before Plaintiffs filed this case in November 2017. Their origin is unknown – maybe they had something to do with the other *Elizarri* case. Still, despite having three years of opportunity, Plaintiffs did not prepare any new declarations to address numerosity for the case at hand.

Again, numerosity is a short hurdle. But it is a hurdle, and it cannot be swept aside or assumed away. Plaintiffs failed to carry their burden over the hurdle, so the motion for class certification is denied. *See Arreola*, 546 F.3d at 794; *Van v. Ford Motor Co.*, 2018 WL 4635649, at *13 (N.D. Ill. 2018); *see also* Rule 23(c)(1)(C). Plaintiffs mustered evidence from two proposed class members. If that's enough to overcome numerosity, then numerosity is not much of a "hurdle[]" – it's more of a painted line on the pavement. *See Riffey v. Rauner*, 873 F.3d 558, 565 (7th Cir. 2017), *vacated*, 138 S. Ct. 2709 (2018).

As an aside, this Court has concerns about some of the other requirements for class certification, too, especially adequacy of representation. But this Court does not need to resolve that issue in light of the lack of numerosity.

---

[6] This Court did not rule on the motion for class certification right away because discovery disputes persisted until early 2022. *See* 1/3/2022 Order (Dckt. No. 165).

Again, based on their declarations, two of the three named Plaintiffs (Jordan and Velleff) do not fall within the class definition because they entered the IDOC before the class period. *See* Declarations, at 22, 39 (Dckt. No. 150-12). Also, according to the record, all three named Plaintiffs received their ID cards from the Defendants as part of the return of property during the litigation. *See* 10/28/2020 Status Report (Dckt. No. 127); 6/18/2021 Letter (Dckt. No. 148) (confirming that Velleff received his ID card during a property exchange); *see* Declarations, at 39 (Dckt. No. 150-12) (stating in 2016 that Velleff had not received his ID card, which Defendants later returned in 2021). Plaintiffs seek "appropriate restitution" for their ID cards, meaning the "cost of replacement." *See* Second Am. Cplt., at 10 (Dckt. No. 140); Pls.' Mem., at 13 (Dckt. No. 150). But based on the record, for the three named Plaintiffs, there is nothing to replace, because they have all of their ID cards. You can't represent a class you aren't in.

### Conclusion

Plaintiffs' motion for class certification is denied.

Date: March 14, 2022

_____

Steven C. Seeger
United States District Judge

28