**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LEONCIO ELIZARRI, by his Special | ) | |
| Administrator LETICIA PEREZ, | ) | |
| GREGORY L. JORDAN, and | ) | |
| TED VELLEFF, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 17-cv-8120 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| SHERIFF OF COOK COUNTY and | ) | |
| COOK COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Leoncio Elizarri, Greg Jordan, and Ted Velleff entered the Cook County Jail and surrendered their personal property, including government-issued identification cards. They were later transferred to the custody of the Illinois Department of Corrections. But they didn't take their property with them. The ID cards stayed behind.

The reason had to do with how the Cook County Jail handles personal property. Detainees often enter the Cook County Jail with personal property, and they have to surrender it at the door. The Cook County Jail will hold their property for a while, but not forever.

The Jail has a policy of requiring detainees or their designees to pick up their personal property within a fixed period of time after they leave. And if they don't, the Sheriff's office will destroy the property.

The Cook County Jail followed that protocol for Elizarri, Jordan, and Velleff. Before they left the Cook County Jail, each of them signed forms acknowledging that the Sheriff would destroy their personal property unless someone picked it up. And no one picked it up.

The detainees later filed suit, alleging that the Cook County Jail violated their Fifth and Fourteenth Amendment rights by withholding and destroying their property. As it turns out, in a twist, the Cook County Jail located most of their property in the middle of this lawsuit. So the detainees shifted gears and allege that the Sheriff violated their rights by depriving them of the use and enjoyment of their property.

Defendants later moved for summary judgment. For the reasons that follow, Defendants' motion for summary judgment is hereby granted.

## Background

Before diving in, the Court makes one brief observation. The case is about detainees' ability to get their hands on their government-issued identification cards after leaving the Cook County Jail. At first blush, it might seem like a small thing. But it isn't a small thing.

Detainees and prisoners need to get back on their feet after they leave incarceration. They need jobs, apartments, and so on. They often need to drive, too. They need identification to do many of the things that they need to do to reintegrate into society. (Try entering a federal courthouse without an ID, and see what happens.)

Detainees and prisoners might not have a compelling need for government-issued ID cards while they are incarcerated. But once they rejoin free society, things change. It is that much harder for former detainees and prisoners to reintegrate into the community if they cannot show who they are.

## I.  Policies and Practices about Detainees' Property

When a detainee enters the Cook County Jail, he surrenders his clothing and personal property to the Sheriff for storage and safekeeping. From that point, where the property goes

depends on what happens to the detainee. *See generally* 3/14/22 Mem. Opin. & Order, at 2–3 (Dckt. No. 169).

If the jail discharges the detainee, the Sheriff returns his property. *Id.* But if the jail transfers the detainee to the IDOC, the Sheriff follows a different procedure. *Id.*

Basically, the IDOC limits the types of property that it accepts from a prisoner arriving from a County Jail. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 201). The Cook County Jail and IDOC draw a line between "compliant property" and "non-compliant property." As the names suggest, the IDOC will accept "IDOC compliant" property, but will not accept "IDOC non-compliant" property. *Id.*

Government-issued identification cards are among the items that are classified as "compliant property." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 2 (Dckt. No. 205). The IDOC allows inmates to have "identification cards, legal mail, personal mail, one religious book such as a Bible or Koran, eyeglasses and a wedding band (no stones)." *See* 6/7/05 IDOC Letter to Sheriffs (Dckt. No. 150-2, at 2 of 2); *see also* Engleson Dep., at 11:11 – 12:19 (Dckt. No. 150-6) (confirming that the 2005 list of allowed property – including identification cards – was still in effect in 2013).

Examples of IDOC non-compliant property include clothing, credit and debit cards, transit cards, personal keys, belts, and shoelaces. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 201).

The Sheriff stores all "compliant property" until the detainee leaves the Jail. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 3 (Dckt. No. 205). But the storage isn't forever.

Compliant property *could* go from the Cook County Jail to the IDOC, meaning that the IDOC would accept it. And in particular, the IDOC would accept government-issued

identification cards from the Sheriff when a prisoner is transferred from the Jail to serve a term of imprisonment in the IDOC. *Id.* at ¶ 4.

But the fact that the IDOC will accept government-issued identification cards does not mean that the Sheriff actually sends the ID cards to the IDOC. In fact, the Sheriff does not send government-issued identification cards to the IDOC along with sentenced prisoners, even though the IDOC would accept them. *Id.* at ¶ 5.

The Cook County Jail typically retains government-issued identification cards – and all other compliant property – for some period of time after a detainee is transferred to the IDOC. *Id.* at ¶ 6. At some point, if the property has not been claimed by the prisoner or a designee, the Sheriff ships the property to a warehouse. *Id.* And then, the Sheriff typically destroys the property after waiting another week to ten days. *Id.*; *see also* Horne Dep., at 14:5-9 (Dckt. No. 202, at 105 of 124).

In other words, the Sheriff treats government-issued ID cards like it treats other compliant property. The Cook County Jail does not send ID cards to the IDOC, even though the IDOC would allow them. Instead, detainees can designate someone to pick them up. If no one picks up the ID cards or other compliant property after a certain period of time, then the Sheriff sends the property to a warehouse, and it is usually disposed of within a week or two. *See* Def.'s Answer to Plaintiff's Fourth Set of Special Interrogatories, at 2 (Dckt. No. 172-2) ("In further response to this special interrogatory, Defendant Sheriff Dart submits that the CCSO/CCDOC has no policy that requires all government-issued ID cards to be destroyed after a detainee is transferred to the custody of the IDOC, but rather has a policy that would permit government-issued ID cards, along with other 'compliant property' to be destroyed if, upon transfer to the IDOC, the detainee fails to designate someone to pick up his or her 'compliant property,' or if no

4

designee picks up the 'complaint property,' including any government-issued ID card, after 45 days.").

Detainees know the drill before they leave the Cook County Jail. The Cook County Sheriff's office provides a preprinted form to detainees who leave the Jail for the IDOC. The form permits a detainee to designate someone to pick up their IDOC non-compliant property, but also contains a preprinted warning to the detainee that the Sheriff will dispose of property that is not picked up by a designee within a specific period of time. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 201).

The property disposition form provides as follows:

> When you were admitted to the Department of Corrections, you may have had clothing items and/or personal property that was inventoried during admission and held during your detention. Belongings known as compliant property were placed in a sealed bag by the arresting agency.

> You are being shipped to the Illinois Department of Corrections or to another facility and cannot take any of the items above with you. You have two choices. You can donate the items or designate someone to pick them up. Below are two sections, Donation Authorization and Authorization for Property Pickup. DO NOT FILL OUT BOTH SECTIONS.

*See* Shipment Donation/Designation Form (Dckt. No. 172-1).[1]

The handbook from the Cook County Jail includes a section about property. Chapter 9 explains that a detainee's property "will be disposed of" if the detainee does not take prompt action after leaving the Jail:

> **What happens to my money and property while I am in the CCDOC?**

> Your personal property (cell phone, keys[,] ID cards, etc.,) are kept at the CCDOC Property Office, located at 2700 S. California Avenue, Chicago,

---

[1] Plaintiffs filed this form in connection with their motion for reconsideration of the class certification ruling. The filing did not reveal when, exactly, the Sheriff used this particular form. The Court offers the form as an example, by way of background only. The forms actually signed by Elizarri, Jordan, and Velleff are in the record, as discussed below.

Illinois.  When you are discharged, you must show the Property Office your photo ID to have your property returned.  Property will be kept in the Property Office for 90 days after you leave the CCDOC, then it will be disposed of in accordance with the CCDOC general order.  For more information, call the Property Office at 773.674.5780.

**Clothing**

Unclaimed personal clothing items shall be placed in the divisional unclaimed clothing (poor box).

**Releasing Personal Property**

You may authorize an individual to retrieve your personal property.  Upon the request of the inmate, CRW's will assist in the release of personal property to another individual or agency.  The inmate will sign a release form identifying the name and address of the person authorized to receive the property.  The receiving party must have valid picture identification.

*See* Cook County Jail Handbook (Dckt. No. 199-14);[2] *see also* 2017 Cook County Jail Handbook

(Dckt. No. 172-4, at 34 of 35) (the Feb. 2017 edition); 2017 Cook County Jail Handbook (Dckt.

No. 172-5, at 42 of 44) (the July 2017 edition); 2018 Cook County Jail Handbook (Dckt. No.

172-5, at 40 of 43) (the June 2018 edition).[3]

## II.    The Plaintiffs

This case involves the fate of government-issued ID cards belonging to three former

detainees:  Leoncio Elizarri, Gregory Jordan, and Theodore Velleff.

---

[2]  Defendant cited and attached the handbook in the summary judgment filings, without revealing which version of the handbook it is (meaning which edition).  Based on the context, the Court understands that this version was in place when Plaintiff Jordan was incarcerated in 2014.  *See* Def.'s Statement of Facts, at ¶¶ 29–45 (Dckt. No. 199) (describing Jordan's detention at the Cook County Jail in 2014–2015).  Plaintiffs also submitted the version of the handbook from July 2017.  *See* 2017 Cook County Jail Handbook (Dckt. No. 202, at 57 of 124).  And the parties submitted a larger collection in connection with the class certification filings (as cited above).  The text is different, but the thrust is largely the same.  The Sheriff notified inmates that he would keep their personal property for only a certain period of time after they left the Cook County Jail.  And at that point, if no one picked it up, the Sheriff would dispose of the property.  In the end, it does not matter which version of the handbook applied in the periods in question.  No party argues that the outcome of the motion turns on which version of the handbook governed.

[3]  Plaintiffs attached the various manuals in support of the motion for reconsideration of the class certification ruling.  *See* Pls.' Mtn. for Reconsideration (Dckt. No. 172).  That filing explains when each manual was in effect.  Again, the Court offers them as background only, for any interested reader who wants the full backstory.

The thrust of each story is basically the same. They entered the Cook County Jail with personal property, including government-issued ID cards. But they left the Jail without it. And they eventually got their property back (for the most part) during this litigation.

### A. Elizarri

Leoncio Elizarri was admitted to the Cook County Jail on or about December 30, 2015. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 201). Elizarri's property was inventoried by the Sheriff and then placed into a property bag. *Id.* at ¶ 16.

On May 12, 2016, Elizarri was transferred from the Cook County Jail to the IDOC. *Id.* at ¶ 17. That day, Elizarri signed the Sheriff's property disposal form, and designated Jose Carrasquillo of Chicago, Illinois to pick up his property from the Sheriff. *Id.* at ¶ 18. (But apparently, he never picked it up.)

The property disposal form notified Elizarri that his property would be destroyed unless someone picked it up. Elizarri signed a preprinted property disposal form with the following notice to the detainee: "If the property is **NOT** picked up within forty-five (45) days of the date of this letter, it will be removed from storage and disposed of accordingly." *Id.* at ¶ 19; *see also* Elizarri Property Disposal Form (Dckt. No. 199-9) (emphasis in original form).

The property disposal form that Elizarri signed also contained the following notice to the detainee: "I, _____, Detainee's ID# _____ do hereby agree that for any reason this letter, mailed by myself, does not reach the designated person, and/or the designated person does not respond within forty-five (45) days from the date of shipment (see above) my property will be disposed of." *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 20 (Dckt. No. 201).

The form was signed. The name "Leoncio Elizarri" is handwritten after "I," and the number "#20151230177" is handwritten after "Detainee's ID #." *Id.* at ¶ 21. Below the second

preprinted notice is a field marked "Detainee's signature" with a signature on the signature line. *Id.* at ¶ 22.

Despite the forewarning, the Cook County Jail did not destroy Elizarri's property. The property bag containing Elizarri's property remained in the possession of the Cook County Jail until it was tendered to Plaintiffs' counsel on December 6, 2019. *Id.* at ¶ 23.

## B. Jordan

Gregory Jordan entered and left the Cook County Jail, twice.

On July 3, 2014, Jordan was admitted to the Cook County Jail. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 24 (Dckt. No. 201). He entered the Jail with personal property. *Id.* at ¶ 25.

That day, Jordan signed a document entitled "Cook County Sheriff's Office Received Clothing." *Id.* at ¶ 26. That document accurately memorializes the items that Jordan relinquished when he entered the Jail. *Id.* at ¶ 27.

Jordan didn't stay in the Cook County Jail long. He was released on July 24, 2014. *Id.* at ¶ 28.

But three days later, he returned. On July 27, 2014, Jordan was once again admitted to the Cook County Jail. *Id.* at ¶ 29.

As a detainee, Jordan was shown a copy of the Inmate Handbook. *Id.* at ¶ 30. Chapter 9 of the Inmate Handbook is titled "Property." *Id.* at ¶ 31. A subsection is titled "Releasing Personal Property." *Id.* Chapter 9 of the Inmate Handbook describes the procedure by which a detainee may authorize another person to retrieve his or her personal property. *Id.* at ¶ 32.

Jordan testified that he did not read Chapter 9, but he "somewhat" understood that the Cook County Jail could dispose of his property if no one picked it up. *Id.* at ¶¶ 33–34. So he

wanted to designate his mother, Rose Jordan, to pick up his personal property. *Id.* at ¶ 35. But for whatever reason, that designation never happened.

On March 13, 2015, Jordan was transferred from the Cook County Jail to the IDOC. *Id.* at ¶ 45.

That day, Plaintiff Jordan signed the Cook County Jail's disposal of property form. *Id.* at ¶ 36. The language of that form was the same as the language in the form signed by Elizarri.

Jordan signed the preprinted property disposal form with the following notice to the detainee: "If the property is **<u>NOT</u>** picked up within forty-five (45) days of the date of this letter, it will be removed from storage and disposed of accordingly." *Id.* at ¶ 37; *see also* Jordan Property Disposal Form (Dckt. No. 199-10) (emphasis in original form).

Once again, the preprinted form contained the following notice to the detainee: "I, _____, Detainee's ID# _____, do hereby agree that for any reason this letter, mailed by myself, does not reach the designated person, and/or the designated person does not respond within forty-five (45) days from the date of shipment (see above) my property will be disposed of." *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 38 (Dckt. No. 201).

Jordan signed the form. The name "Gregory Jordan" is handwritten after "I," and the number "#20140727148" is handwritten after "Detainee's ID #." *Id.* at ¶ 39. Below the second preprinted notice is a field marked "Detainee's signature" with a signature on the signature line. *Id.* at ¶ 40. Plaintiff Jordan signed his name next to "Detainee's signature." *Id.* at ¶ 41; *see also id.* at ¶ 42 (summarizing Jordan's testimony about signing the form).

Jordan did not write his mother's name anywhere on the preprinted property designation form. *Id.* at ¶ 43. And his mother did not make any attempt to retrieve his personal property, either. *Id.* at ¶ 44.[4]

Despite the forewarning, the Cook County Jail did not destroy Jordan's property. The property bag containing Jordan's property remained in the possession of the Cook County Jail until it was tendered to Plaintiffs' counsel on October 28, 2020. *Id.* at ¶ 46.

### C. Velleff

Theodore Velleff has gone in and out of the Cook County Jail, multiple times.

Velleff was admitted to CCDOC on July 9, 2010, on December 23, 2010, on September 9 or September 25, 2013, and again on September 27, 2016. *Id.* at ¶ 47.

He relinquished possession of personal property to CCDOC, including clothing, identification cards, keys, belt, and shoelaces. *Id.* at ¶ 48.

On January 24, 2014, and again on August 1, 2017, Velleff signed CCDOC's preprinted disposal of property form. *Id.* at ¶ 49.

Once again, the preprinted property form included a notice to the detainee about the disposal of property. *Id.* at ¶ 50. It covered "clothing/belongings" that the detainee was not taking to the penitentiary. *See* Velleff 2014 Property Disposal Form (Dckt. No. 199-11). The form contained the following forewarning: "If this clothing is not picked up within thirty (30) days of the date of this letter, it will be removed from storage and disposed of." *See* Pls.' Resp.

---

[4] The form included handwriting that suggested that Jordan wanted the Cook County Jail to donate his property. In the place where the detainee could designate a person for picking up the property, the form includes "DONATE" in large, handwritten letters. *See* Jordan Property Disposal Form (Dckt. No. 199-10). But in his responses to requests to admit, Jordan denied that he wrote the word "DONATE." *See* Pl. Jordan's Resp. to Def.'s Requests to Admit, at ¶ 12 (Dckt. No. 199-13). The Court does not place any importance on that word, one way or the other.

to Def.'s Statement of Facts, at ¶ 50 (Dckt. No. 201); *see also* Velleff 2014 Property Disposal Form.

Velleff could have designated a person to pick up the property. Instead, large handwritten letters appear: "N/A." *See* Velleff 2014 Property Disposal Form (Dckt. No. 199-11).

Below that notice to the detainee is a field preprinted "Detainee Signature." Plaintiff Velleff signed his name next to that field. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 51 (Dckt. No. 201). Plaintiff Velleff signed the disposal of property form on January 24, 2014. *Id.* at ¶ 52. By signing the form, Velleff acknowledged that his property "will be disposed of" after 30 days if he or his designee did not pick it up. *Id.*

A few years later, on August 1, 2017, Velleff signed another preprinted property disposal form. The 2017 form contained the following forewarning: "If the property is **NOT** picked up within forty-five (45) days of the date of this letter, it will be removed from storage and disposed of accordingly." *Id.* at ¶ 53; *see also* Velleff 2017 Property Disposal Form (Dckt. No. 199-12).

The August 1, 2017 property disposal form included the following notice to the detainee: "I, _____, Detainee's ID# _____, do hereby agree that for any reason this letter, mailed by myself, does not reach the designated person, and/or the designated person does not respond within forty-five (45) days from the date of shipment (see above) my property will be disposed of." *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 201).

Velleff signed the 2017 form. The name "Velleff, Theodore" is handwritten after "I," and the number "#20160927058" is handwritten after "Detainee's ID#." *Id.* at ¶ 55. Below the second preprinted notice is a field marked "Detainee's signature" with a signature on the signature line. *Id.* at ¶ 56. Velleff signed his name next to "Detainee's signature." *Id.* at ¶ 57.

11

At deposition, Velleff acknowledged signing the disposal of property form. *Id.* at ¶¶ 58–59. He also acknowledged knowing that, if no one picked up his property within 45 days from the date of his signature, the Cook County Jail would dispose of his property. *Id.*; *see also* Velleff Dep., at 56:13 – 58:7, 66:13-17 (Dckt. No. 153-1).

Velleff has never designated anyone to pick up his property from the Cook County Jail. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 61 (Dckt. No. 201); *see also* Velleff Dep., at 51:16 – 52:3, 58:19-24 (Dckt. No. 153-1).

Velleff left the Cook County Jail on January 24, 2014, and again on August 1, 2017, and was transferred to the IDOC. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 62 (Dckt. No. 201).

A property bag with a ship date of January 24, 2014 containing personal property of Plaintiff Velleff was tendered to Plaintiffs' counsel on June 17, 2021. *Id.* at ¶ 63.

## III. Procedural History

In 2017, Plaintiff Leoncio Elizarri (only) filed this putative class action against the Sheriff of Cook County and against Cook County itself. *See* Cplt. (Dckt. No. 1). Taking a step back, this case wasn't the first time that Elizarri had filed suit against the Sheriff and Cook County about his property. In 2007, he filed a class action lawsuit about the Sheriff's failure to prevent the theft or loss of detainees' belongings. *See Elizarri v. Sheriff of Cook Cnty.*, 901 F.3d 787 (7th Cir. 2018) (affirming a jury verdict in defendants' favor).

While that appeal was pending, Elizarri filed this second suit, meaning the case currently before this Court. He made another challenge about his property, but he offered a new theory. And since filing his original complaint in the case at hand, Elizarri has changed his claims a few times, too.

12

The case at hand is about the Sheriff's failure to send property to the IDOC. Elizarri claimed that the Sheriff had failed to send "compliant property" – meaning property that the IDOC would accept – to the IDOC when Elizarri left the Jail and entered IDOC custody. *See* Cplt., at ¶ 26 (Dckt. No. 1). When he was arrested, Elizarri had $22.50, a driver's license, a Social Security card, a cell phone, and a few other belongings. *Id.* at ¶ 22.

Instead of sending the property to the IDOC, the Sheriff "continu[ed] to hold plaintiff's personal property" in violation of the Fourth and Fourteenth Amendments.[5] *Id.* at ¶¶ 27–28. Elizarri sought an injunction "requiring the Sheriff to return all property belonging to former detainees at the Jail and to make appropriate restitution for property that has been lost, misplaced, or stolen." *Id.* at 7.

Elizarri later filed an amended complaint that added Gregory Jordan as a named plaintiff. *See* First Am. Cplt. (Dckt. No. 42). When Jordan was arrested, his personal property included keys, a state identification card, a Social Security card, a wallet, and a belt. *Id.* at ¶ 30.

About a year later, the case was reassigned from Judge Durkin to this Court. At the initial status hearing (during the so-called cattle call for each of the 342 reassigned cases), defense counsel made a significant revelation. *See* 11/8/19 Tr., at 17–23 (Dckt. No. 89).

Defense counsel reported that Defendants had located the property of the two named Plaintiffs. In fact, defense counsel sent a letter to Plaintiffs' counsel in August *2018* – more than a year earlier – about the discovery of the property. *See* 11/14/19 Letter (Dckt. No. 88) (attaching letters to counsel dated August 17, 2018 and September 23, 2019); *see also* Initial Status Report for Reassigned Case, at 2 (Dckt. No. 79) ("The Sheriff has notified the Plaintiffs that specific items of their property have been located.").

---

[5] The operative complaint is the Second Amended Complaint. Plaintiffs no longer invoke the Fourth Amendment. *See* Second Am. Cplt. (Dckt. No. 140).

But nothing had been done.

Defendants were ready to return the property to Plaintiffs, and Plaintiffs were ready to receive it from Defendants. *See* 11/8/19 Order (Dckt. No. 85) ("Defendants do not object to returning the Plaintiffs' property, and Plaintiffs do not object to the return of their property. Everyone agreed at the hearing that the property should be returned."). Plaintiffs wanted their property, and Defendants wanted to give it back.

Peace, seemingly, was breaking out. This Court did not see a need for an injunction to compel Defendants to do something that they were willing to do voluntarily. So, this Court directed the parties to come back to the courthouse at a later time, and complete the property exchange. *Id.* The parties agreed to the property exchange, without objection:

| The Court: | But to the best of your knowledge, do the defendants still have the plaintiffs' personal property? |
| --- | --- |
| Defense Counsel: | Yes. |
| The Court: | Do you know where it is? I mean, your clients, do they know where it is and can they get it? |
| Defense Counsel: | I believe they can, Judge. |
| | * * * |
| The Court: | Have the plaintiffs made any attempt to retrieve their property? |
| Plaintiffs' Counsel: | No. Well, I mean, not after filing the lawsuit. |
| The Court: | In – since 2017, have the plaintiffs made any attempt to retrieve their property? |
| Plaintiffs' Counsel: | No. |
| | * * * |

| | |
|---|---|
| The Court: | I'll be real direct with you. When I read this report, I thought to myself, should I just order the defendants to bring the property to my courtroom and we'll just do a little handoff. Would anyone object to that? |
| Defense Counsel: | No. |
| Defense Counsel: | We have no objection. |
| Plaintiffs' Counsel: | We would not object. |
| | * * * |
| The Court: | But it seems to me, candidly, like it's a waste of time and money and resources to continue to do the lawsuit, especially the expense of discovery, when peace seems to be on the verge of breaking out. |

*See* 11/8/19 Tr., at 18:19-24, 21:20 – 22:1, 22:11-18, 24:15-18 (Dckt. No. 89).

That property exchange took place outside the courtroom on December 6, 2019. *See* 12/6/19 Order (Dckt. No. 96). The parties filed a stipulation to memorialize the return of the property. *See* Letter (Dckt. No. 95); Stipulation (Dckt. No. 97).

For Elizarri, the returned property included an Illinois identification card,[6] a Chicago library card, sunglasses and cases, two Links cards, jewelry, and a few other items. *See* 12/6/19 Letter (Dckt. No. 95). For Jordan, the returned property included a wallet, business cards, CTA fare cards, a Social Security card attachment, a Social Security letter, part of a dollar bill, and so on. *Id.*

Defendants later found another bag containing Jordan's property, and a second property exchange took place. *See* 1/17/20 Status Report (Dckt. No. 100); 1/22/20 Order (Dckt. No. 102); 4/27/20 Order (Dckt. No. 114); 7/26/20 Status Report (Dckt. No. 121); 10/22/20 Order (Dckt.

---

[6] The Court understands the Illinois identification card to be a driver's license. *See* 8/17/18 Letter (Dckt. No. 150-7).

No. 126); 10/28/20 Status Report (Dckt. No. 127); 10/30/20 Order (Dckt. No. 128). The returned property included a "copy" of an Illinois identification card. *See* 7/26/20 Status Report.

At that point, the return of the property was complete. Elizarri and Jordan agreed that they received all of their property. Simply put, "Defendants have returned all the property belonging to the named plaintiffs." *See* 10/28/20 Status Report (Dckt. No. 127).

The return of the property called into question whether Elizarri and Jordan could serve as adequate class representatives. *See* 11/16/20 Order (Dckt. No. 129). Elizarri and Jordan can't represent a class of people seeking the return of their property if Elizarri and Jordan aren't seeking the return of their property. But the answer could be different to the extent that they seek compensation (if any) for the deprivation of their property in the past. It may depend on whether the class is seeking prospective or retrospective relief.

Plaintiffs then requested and received leave to amend the complaint yet again, adding Ted Velleff as a class representative. *See* Mtn. to Amend Cplt. (Dckt. No. 132); 4/19/21 Order (Dckt. No. 136); Second Am. Cplt. (Dckt. No. 140). Plaintiffs expressly did so in light of the concern about whether Elizarri and Jordan could continue to serve as class representatives, given the return of their property. *See* Mtn. to Amend Cplt., at 2 ("The proposed amended complaint therefore adds Ted Velleff, a former detainee at the Jail, as a plaintiff to ensure that the putative class will be adequately represented.").

When Velleff was arrested, he had a state identification card, a belt, white shoelaces, and a few documents in his possession. *See* Second Am. Cplt., at 29 (Dckt. No. 140); 7/14/21 Status Report (Dckt. No. 148).

The Second Amended Complaint includes three claims about Defendants' handling of detainees' clothing and government identification. Before, Plaintiffs only brought claims about

16

compliant property (like ID cards). But the Second Amended Complaint added claims about detainee clothing, which is non-compliant property for the IDOC (meaning that prisoners weren't allowed to have it). *See* Second Am. Cplt., at ¶ 16 (Dckt. No. 140) (confirming that clothing is compliant property for the Cook County Jail, but is non-compliant property for the IDOC).

First, Plaintiffs allege that Defendants took detainees' clothing and gave it away in violation of the Takings Clause of the Fifth Amendment. *Id.* at ¶¶ 17–22. The Fifth Amendment claim is about clothes, as revealed by the text and the heading: "THE TAKINGS CLAIM: DETAINEE CLOTHING." *Id.* at 4.

Second, they claim that Defendants destroyed "stored detainee property" – including identification cards and other items – without notice in violation of the Fourteenth Amendment. *Id.* at ¶¶ 23–39. Plaintiffs allege that the Sheriff stopped destroying IDOC non-complaint property in 2008, but resumed that practice in 2018. *Id.* at ¶¶ 24, 36. That claim didn't fit well with two (if not three) of the named Plaintiffs. The Sheriff "returned the Elizarri property during the pendency of this ligation," and "located and returned two of the bags inventoried from plaintiff Jordan." *Id.* at ¶¶ 30, 31.

Third, Plaintiffs allege that Defendants failed to give notice to detainees that their property was available for pickup, in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at ¶¶ 40–43.

Plaintiffs later moved for class certification. *See* Pls.' Mtn. for Class Certification (Dckt. No. 146). Plaintiffs originally sought to certify four subclasses.

Plaintiffs sought certification of a "clothing" subclass, called the "Fifth Amendment Takings Subclass." *Id.* at 1. Plaintiffs also requested certification of three "Fourteenth

Amendment Damages Subclasses." *Id.* The first Fourteenth Amendment subclass was a "government identification" subclass. *Id.* Another Fourteenth Amendment subclass involved property that was sold, destroyed, or lost after November 9, 2015. *Id.* The final Fourteenth Amendment subclass involved property that remains in the Sheriff's custody. *Id.*

Plaintiffs then backtracked and narrowed their request for class certification. In their supporting memorandum, Plaintiffs requested certification of two subclasses, not four. The first subclass included "[p]ersons whose clothing was taken by the Sheriff to be used by detainees upon release from the Cook County Jail (Fifth Amendment Takings Subclass)." *See* Pls.' Mem., at 1–2 (Dckt. No. 150). The second subclass included "[p]ersons whose government issued identification remained in the custody of the Sheriff of Cook County (Fifth and Fourteenth Amendment Damages Subclass)." *Id.*

In their reply brief, Plaintiffs continued to whittle. Plaintiffs acknowledged that the Seventh Circuit's decision in *Conyers v. City of Chicago*, 10 F.4th 704 (7th Cir. 2021), undercut the request for certification of a "clothing" subclass. *See* Pls.' Reply, at 1 (Dckt. No. 155). So Plaintiffs "withdr[e]w their request for certification of the 'clothing' subclass." *Id.*

After that whittling, Plaintiffs explained that the "'government identification' claim challenges the Sheriff's policy of refusing to send government issued identification to the Illinois Department of Corrections when transferring a prisoner from the Cook County Jail to the IDOC." *See* Pls.' Reply, at 2 (Dckt. No. 155). Plaintiffs asked the Court to certify a class of "[a]ll persons who left the Cook County Jail to serve a sentence in the Illinois Department of Corrections on and after November 9, 2015 and whose government issued identification remained in the custody of the Sheriff of Cook County." *Id.* at 8; *see also* Pls.' Mtn. for Class Certification, at 1 (Dckt. No. 146).

18

This Court ultimately denied the motion for class certification.  *See* 3/14/22 Mem. Opin. & Order (Dckt. No. 169).  The Court concluded that Plaintiffs had failed to satisfy the numerosity requirement of Rule 23.  *Id.*  The record was thin, if not barren.  Plaintiffs offered 42 declarations, but 40 of the 42 declarants were not members of the putative class.  *Id.* at 2.

Plaintiffs later filed a motion for reconsideration of the class certification ruling, which this Court denied.  *See* Pls.' Mtn. to Reconsider (Dckt. No. 172); 8/16/22 Mem. Opin. & Order (Dckt. No. 188).

Meanwhile, Defendants located property belonging to Velleff (from his detention in 2013–2014), and returned those items on June 16, 2021.  *See* 7/14/21 Status Report (Dckt. No. 148); 7/27/21 Order (Dckt. No. 151).  For Velleff, the returned property included an Illinois identification card, a belt, shoelaces, and some documents.  *See* 7/14/21 Status Report; *see also* 6/18/21 Letter (Dckt. No. 148) (summarizing the property exchange).

Velleff questioned whether the Jail also has more property, from his detentions in 2009, and again in 2010, and again in 2016.  *See* 8/6/21 Status Report (Dckt. No. 152).  But Defendants could not locate any such property.  *Id.* at 2.

Velleff doesn't know if Defendants have returned all of his property.  Velleff is "unable to form at the present time a belief, consistent with Rule 11 . . . about whether the Sheriff continues to possess the property listed in the preceding paragraph."  *Id.* at 2.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of

19

establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

### Analysis

Out of the box, Plaintiffs begin their motion for summary judgment by abandoning many parts of their case. Plaintiffs acknowledge that they limited their motion for class certification to the "Sheriff's policy of refusing to send government-issued identification to the Illinois Department of Corrections when transferring a prisoner from the Cook County Jail to the IDOC." *See* Pls.' S.J. Brf., at 1 (Dckt. No. 200).

That whittling extends to the claims on the merits, too. "Plaintiffs adhere to this narrowing of their claims and knowingly and intentionally waive all claims, including claims involving detainee clothing, other than those discussed below." *Id.*

Based on that concession, the Court grants Defendants summary judgment on all claims involving any property other than government-issued identification cards. The claims about the ID cards are all that is left.

The parties agree that Elizarri, Jordan, and Velleff surrendered government-issued ID cards when they arrived at the Cook County Jail. The parties also agree that the Sheriff located the ID cards during the pendency of this case. And the parties agree that the Sheriff returned the ID cards. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 205) ("An Illinois state identification card was included in the property that defendant Sheriff returned to counsel for original plaintiff Leoncio Elizarri on December 6, 2019."); *id.* at ¶ 11 ("An Illinois state identification card was included in the property that defendant Sheriff returned to counsel for plaintiff Gregory Jordan on July 20, 2019."); *id.* at ¶ 12 ("The Sheriff retained until June 17, 2021 the property, including a government issued ID card, that had been taken from plaintiff Velleff in 2013."). Elizarri and Jordan received all of their property back, and Velleff received all of his property from the 2013 incarceration.

At most, there is an open question about what happened to any property that Velleff surrendered in connection with his 2016 incarceration. That property became eligible for destruction on January 25, 2018. *See id.* at ¶ 13. There is no reason to think that such property still exists. The Sheriff has not located it, and Velleff previously stated that he was "unable to form at the present time a belief, consistent with Rule 11 . . . about whether the Sheriff continues to possess the property listed in the preceding paragraph." *See* 8/6/21 Status Report, at 2 (Dckt. No. 152).

The punchline is that Plaintiffs entered the Cook County Jail with government-issued ID cards. They later were transferred to the custody of the IDOC. The Sheriff, however, did not

transfer those ID cards to the IDOC, even though the IDOC would have accepted them. But the Sheriff did not destroy the ID cards, either. Instead, the Sheriff hung on to the ID cards – for *years*. And during this lawsuit, the Sheriff returned the ID cards to Plaintiffs' counsel, so Plaintiffs and their ID cards were reunited.

The question on the table is whether the claims involving the ID cards pass muster and can go to trial. The Court concludes that they cannot. The claims run headlong into a wall of case law from the Seventh Circuit.

The Seventh Circuit addressed a similar claim in *Conyers v. City of Chicago*, 10 F.4th 704 (7th Cir. 2021). There, arrestees challenged the City's handling of property seized during an arrest. Sometimes arrestees will possess property that is not permitted in the Cook County Jail, like cell phones. In that case, the City had a policy of storing the property for 30 days. If the property was not picked up by then, the City disposed of it.

Several arrestees challenged the City's policy with a smattering of arguments under the Fourth, Fifth, and Fourteenth Amendments. The Seventh Circuit rejected them all.

For starters, the Fourth Amendment was an ill fit for a claim about the continued retention of property, when there was no question whether the government properly seized the property in the first place. *See id.* at 710 ("[T]hat issue falls more naturally under the Due Process Clause of the Fourteenth Amendment, or perhaps the Takings Clause of the Fifth Amendment."). The Fourth Amendment does not govern if the government lawfully seized the property at the inception.

The Seventh Circuit rejected the takings claim under the Fifth Amendment, too. The Court of Appeals held that the City was entitled to treat the property as abandoned. "Nothing compels the City to hold property forever." *Id.* at 711.

22

Along the way, the Seventh Circuit pointed out that the arrestees had notice that the City would dispose of their property. And the arrestees had a way to make sure that the City would not destroy it. "First, the detainee knows exactly what has been taken from him and when that confiscation occurred. Second, the detainee is told both how (either personally or through a representative) to get his property back and how quickly he must do so. Finally, the hard-copy Notice plainly states that '[i]f you do not contact the CPD to get your property back *within 30 days of the date on this receipt*, it will be considered abandoned under Chicago Municipal Code Section 2-84-160, and the forfeiture process will begin . . . .'" *Id.* (emphasis in original).

Based on that notice and opportunity to act, the Seventh Circuit held that the City was "entitle[d] . . . to treat as abandoned any property that remains unclaimed after 30 days have gone by." *Id.* at 712. And once the property was abandoned, it did not belong to anyone. *Id.* So no one had any property rights, which means that no one could bring a takings claim. *Id.*

The final claim involved due process under the Fourteenth Amendment. The Seventh Circuit reached the same conclusion, for similar reasons. "Due process demands both adequate notice and an opportunity to be heard before the state may take property." *Id.* at 712. But the arrestees had adequate notice of the City's policy. *Id.* at 712–15. And they had an adequate opportunity to retrieve their property, too. *Id.*

At bottom, the Seventh Circuit made clear that the City did not have a constitutional obligation to retain an arrestee's property forever. "[W]e can find no support in due-process cases for the proposition that the City must serve as an involuntary bailee of property for lengthy periods of time, incurring all of the costs and responsibilities that such a status would implicate." *Id.* at 715.

The Seventh Circuit built upon *Conyers* in *Kelley-Lomax v. City of Chicago*, 49 F.4th 1124 (7th Cir. 2022). Arrestees once again challenged the City's policy about seizing property, and then disposing of it in 30 days if no one picked it up. But this time, the arrestees challenged the City's policy as a violation of substantive due process.

Substantive due process depends on a right with "deep roots in our history and traditions." *Id.* at 1125. And there was no longstanding right to have the government serve as a custodian for property *ad infinitum*.

The question was not whether property ownership was a fundamental right. The question was whether there was a historical tradition of the state holding property for extended periods of time. "Instead the plaintiff must address the actual policy at stake: the government's unwillingness to serve as unpaid bailee for indefinite periods. And on that score Kelley-Lomax does not even try to show that such a role for government has historical provenance." *Id.* 1125.

*Conyers* and *Kelley-Lomax* foreclose any claim by Plaintiffs here. The Sheriff informed detainees that it would not transport their property to the IDOC. The Sheriff let them know that someone could pick up their property within a fixed period of time. And the Sheriff let them know that if no one retrieved the property, the Sheriff would pitch it.

Elizarri, Jordan, and Velleff received adequate notice about the Sheriff's plans for the property. Each of them signed a property disposition form, and each form forewarned them that the Cook County Jail would not keep their property forever.

Plaintiffs do not argue that the notice was constitutionally deficient. And Plaintiffs do not claim that they lacked an adequate opportunity to preserve their property. So, the record shows that the Sheriff satisfied both requirements of due process. The detainees received

adequate notice, and they had an adequate opportunity to protect their interests and get their belongings.

Plaintiffs contend that this case is different than *Conyers* and *Kelley-Lomax* because this case involves property that the Sheriff could have sent to the IDOC. That is, in *Conyers* and *Kelley-Lomax*, the City seized property that the Cook County Jail would not accept. But here, the property in question involves government-issued ID cards, and the IDOC would have accepted the ID cards if the Cook County Jail had sent them.

That's a distinction without a difference. Nothing in *Conyers* or *Kelley-Lomax* turned on the type of property at issue. And the outcomes did not turn on whether the property had somewhere else to go. It did not matter if the other facility would have accepted the property. The constitutional requirements do not change based on whether another facility would take the property.

What matters is whether the government gave the inmates adequate notice about what would happen to their property, and gave them an adequate chance to retrieve it. And here, as in *Conyers* and *Kelley-Lomax*, the government did.

The Constitution did not require the Sheriff to ship the property to the IDOC, either. The Fourteenth Amendment requires notice and an opportunity for retrieval before destroying personal property. But the Constitution does not require transportation services, or free shipping.

Plaintiffs end by offering a smattering of cases about the historical tradition of the government serving as a custodian for property. The cases do not move the needle. The cases hover at a high level of generality. They basically acknowledge that the government has some responsibility for property that it seizes. *See* Pls.' S.J. Brf., at 6–7 (Dckt. No. 200). But the cases do not stand for the proposition that the government must keep property forever. And the cases

25

do not call into question the practice of disposing of property after giving inmates fair notice and a fair chance to retrieve it.

Lurking over everything is a fact that looms large. At the end of the day, Elizarri and Jordan received all of their property back. The Sheriff returned their property – including government-issued ID cards – during this litigation. Velleff also received much of his property back, including a government-issued ID card. (Again, Velleff believes that he also surrendered an ID card during his incarceration in 2016. But he went to the IDOC in 2017, and that property became eligible for destruction in early 2018. For the sake of argument, the Court assumes that the Sheriff disposed of that ID card.).

On this record, the Sheriff would not have committed a constitutional injury even if he had destroyed their property. So it is hard to see how the Plaintiffs could have suffered an injury when they got their property *back*.

Maybe they could advance a theory that they lost the use and enjoyment of their property in the meantime. But if the government could have destroyed their property without violating their rights (because of the adequate notice), then the government did not violate their rights by withholding it for a while, and then giving it back.

### Conclusion

For those reasons, Defendants' motion for summary judgment is hereby granted.

Date:   August 21, 2023

_____

Steven C. Seeger
United States District Judge